Good morning, Your Honors. Good morning. Sorry, I wasn't sure you were ready for me. Good morning, Your Honors. David Hackett with the King County Prosecutor's Office, representing King County in this matter. This case is a matter of first impression in the Ninth Circuit with a fairly unique set of facts, and it presents those questions, how to evaluate use of force and searches in the context of an officer's community caretaking function. And precisely because this is not an area where there is an abundant or clearly established law, this is why Deputy Heather Volpe and Deputy Sawtelle and Christian were entitled to qualified immunity, and the district court should be reversed. I'd like to focus my argument on that second prong of the qualified immunity test, the question of whether the law was clearly established. And I think in both areas, both the use of force and the search, the law is not clearly established, thus supporting a grant of qualified immunity. As this court is aware, qualified immunity is granted to all but the plainly incompetent, and that when you are looking for a clearly established right, it must be a right that is established with a high degree of specificity. For example, whether use of force is appropriate to protect the right of a suicide victim to access to emergency medical care. That would be the type of specificity that the Supreme Court requires, a right not to have a back on your knee during a tussle incident to arrest. Let me see if I can cut to the chase here. Is your position that the district court erred in evaluating the use of force in conjunction with a misdemeanor resisting a public servant in the performance of her duties when the court should have said that the force was employed in order to permit life-saving medical services to be administered to her son and this was a life-and-death situation? I think that is precisely the correct chase to cut to. To analyze this as an obstruction case really misses the point. The point was the officer was there to help EMTs administer life-saving aid to Ms. Ames' son. Arguably, Ms. Ames committed a couple crimes during the course of that, but that's not why the officer was there. That's not why the officer used force, and that's not the case law, frankly, that it should be analyzed under. When the scene, because the opposing counsel is going to get up and talk about the first part of the sequence, I'm sure, about the statements that were made by the officer that caused the EMTs to come out of the apartment. But once everybody gets here, we can sort of move forward in the sequence. Once everybody got to the, I think it's a car or a pickup truck? It was a small pickup truck, yeah. Thank you. Once it got to that point, I just have a really specific question about the evidence. I think the officer testified that she made statements to the effect of, you know, let us help him. Because once the son was out of the apartment, it's striking to me that people weren't helping him there, either on the ground or in the ambulance or something. And I think there's a difference of opinion about or discrepancy in the testimony about whether the officer ever said at that point that the EMTs would be allowed to assist. The discrepancy is in Ames' own submissions. Right. So Ames' recorded statement. She says it both ways, right? Yeah, she says in her recorded statement, which happens right on the scene, right at the time, that the officer did request that they be allowed to help her son. She says in her declaration she specifically denies hearing anything from the officer to that effect. Right. So those two documents are not reconcilable. And under summary judgment law, a plaintiff cannot create her own material issue of fact. So at that time when that discussion was going on, and I say discussion sort of loosely, I recognize it was a very heated moment, the plaintiff was seated behind the wheel, right? Yes, eventually she was seated behind the wheel with her son in the car next to her. And I think trying to put the keys in the ignition, is that right? Yes. And the record establishes that her hands were on the steering wheel, that she was intending to back up even though a police car was blocking her way. The record has established that the officer told her that it was illegal to move, that she was not going with her son. And she was clearly frantic and very concerned about her son's life, and I think justifiably so. So what is your response to opposing counsel's position, which is that the force used in taking her out of the car, she says that her face was pushed into the ground a couple of times. What is your response to that? Their argument is that the force was excessive. Well, I think if we're looking at the question whether there's a Fourth Amendment violation, which of course is separate from the clearly established right, I would say that there is no Fourth Amendment violation. If you apply Graham in a fashion that would be more appropriate to a community caretaking question, and this is the problem with the clearly established right. I know I promised not to get into that. But Graham is not terribly conducive to analyzing the use of force in a community caretaking situation. But if we massage Graham, you have an officer faced with what she perceives, and I think what is a reasonable need, to provide life-saving care to this individual on the scene. That's why the paramedics were called and advanced life support was required. The officer stopped, right? She stopped before she did this and phoned a supervisor to say, what do I do, because the situation was so unusual. And I take it that the supervisor instructed her to stop the driver. I believe that all happened fairly contemporaneously. So, of course, the car is moving it back. Discussions are had on the radio. The officer goes up and searches herself in the doorframe. Ms. Ames acknowledges that she was trying to shut the door, does not deny the officer's testimony that the officer was struck with the door. There is no denial that Ms. Ames had her hands on the steering wheel. And as Your Honor recognizes, this was a fairly rough situation. You're looking at a mother who's about to take control of a 3,500-pound vehicle with a police car behind her. And a police officer next to that vehicle stuck in the door. At that point, even under a Graham analysis, that use of force to remove her from the truck would certainly be reasonable and justified. That use of force meaning there was a pull, grabbing the hair to get her out. Meaning the hair hold so that she takes her hands off the steering wheel, reaches her hands, taking her by the arm and the hair, putting her on the ground. And at that point, the testimony is also, I think, uncontroverted that there was some difficulty. Ms. Ames could not provide her arm for handcuffing. Ms. Ames was swearing at the officer. Ms. Ames was definitely not a happy camper, I think would be a light way to put it. Okay, but there's the force used to extract her from the vehicle, and then there's the force used on the ground. And I understand you're relying on immunity. Yes. But is it your position that the force used on the ground was appropriate? Yes. You had a person struggling with the officer. Keep in mind that Officer Heather Volpe is on this scene by herself. The people on the scene are Ms. Ames, but also her neighbors, who are unknown to Ms. Volpe. It's unknown how they will react. She had called for backup. Backup had not arrived. So the officer did have a need, without questioning it with 20-20 hindsight, to take control of that scene so that the officer was not in danger. Thank you. I think you've answered my question. Okay. And then that, of course, wraps around to the clearly established right problem. I'm sorry, Mr. Hyatt. I do have one clarification. Sure. I think Judge Grissin asked you, she did call her supervisor for instructions, and he told her, look, she needs to let the aid crew work on him, right? Yes. It was a very unusual situation. She consulted with her sergeant, and that is in the record. The sergeant told her, you've got to clear the way for the aid crew to work on her. You described it as contemporaneous, but I think that call happens, that radio transmission happened before Ms. Ames was extracted from the pickup truck. Yes, it definitely happened before she was removed from the pickup truck. By contemporaneous, I mean, you know, possibly a few steps before it enters the door. It all happens very quickly, as the courts are aware. Looking at the use of force under the clearly established right case, you do have the Sixth Circuit case, the Stryker case, which really involves a fairly extreme use of force, the drawing of a weapon inside a home to assist with a suicide victim. That is the type of case that precludes a clearly established right in this situation. You also have the Goldsmith case, which is published out of the Western District of Washington, which, while it does not have facts completely similar to this, I think Stryker is the only one that is completely similar to this, talks about a fairly high-level force used to allow paramedics to treat an individual who is in mental crisis. Those cases, I think, along with the Supreme Court's direction in Sheehan that a general gram right, even in a criminal context, is a nonstarter. You need something more specific. The problem with this case, the problem that plaintiffs can't overcome and plaintiffs' burden in this case was to show a clearly established right. That has never been shown, and the District Court erred by not addressing that question. I'd like to turn quickly to the search question. This is also another situation where there is no clearly established right. In the Stryker case from the Sixth Circuit, you had a search inside the house for suicide drugs, looking in drawers and cupboards throughout a house. The officers, the testimony is well established that the officers' standard practice was to arrive on the scene, help assist with suicide drugs, try and find those things to help administer care to the individual. They looked at the truck, which is where Mr. Bugante was found. On the seat of the truck, they see the suicide note. They open up the glove box, which is in front of Mr. Bugante. They actually find prescription drugs with Mr. Bugante's name on them, although I don't believe those were the correct drugs. They find a gun. They don't try and trump up any gun charges. Instead, they clear the weapon, make sure that it was not stolen, and put it under the seats. By making sure it was not stolen, I couldn't figure out the sequence. When was the call made to make sure it wasn't stolen? I think that call was made immediately upon finding the gun, just to check and make sure that it wasn't registered as a stolen gun. Well, your brief takes the position that the officers weren't investigating a crime. They were trying to find the drugs to assist with a medical emergency, right? So it struck me as somewhat inconsistent for the action to stop, if that was the goal, for the action to stop to check to see if the gun was stolen. But having said that, I can't tell when the call was made. Of course, by necessity, it would have to be made after finding the gun. Yes, but what about vis-à-vis the reporting to the EMTs about what medicine had been found? That's the sequence that is interesting to me. The officer Sawtelle does not have a specific memory of when he told the individual, so the record is silent on that point. Okay, so at least I didn't miss it. That's comforting. I have another question about this because the opposing counsel's brief, you'll have an opportunity to respond in a minute, but I think the opposing counsel's brief takes the position that these officers who were searching the glove compartment didn't report the medicines to the EMTs. But I think the EMTs, and I think there's only one officer, had a declaration indicating that his standard practice would be to report it, but he can't remember whether he did or not. So two questions. Was there a declaration from the other officer? The other officer was sick at the time, so he had cancer. We were not able to get declarations from him. So we don't know what he would have said about that? It is silent on the record, yes. Okay, and then as to the officer who did provide a declaration, did he say that he doesn't recall or did he say that he didn't give that information to the EMTs? He says very clearly that he does not recall. He does not have a specific memory of giving the information to the EMTs, but that his standard practice is to provide that information. Thank you. And so with that, I'd ask to reserve my time. You may. Well, Your Honors, Darrell Parker for the appellee. Before I forget, I want to address one point, and that is he argues that pulling Ms. Ames by the hair was necessary to get her out of the car because he was by himself. One, there's no evidence that any command was ever given to her to get out of the car. There's no evidence that anything other than pulling the hair was ever attempted. Well, I thought she testified that she was trying to close the door so that she could drive off and take her son to the hospital, and that's why she had both her hands on the steering wheel before she reached for the door. I don't believe that she testified that she was trying to close the door. She testified that she put the key in the ignition, or she was trying to put the key in the ignition. I think this part of the sequence is important as well, and my reading of the record was that she was doing two things with her hand. One was trying to put a key in the ignition, and one was trying to close the door, but that she was actually looking over to the passenger seat to check that her son was belted in. So it didn't seem to me that the evidence supported that she was trying to hit the officer with the door, but that she surely did hit the officer with the door. Do you read that differently? Well, the officer testified that she hit her with the door repeatedly. Right. But that's not the way. If you draw the inference in Ms. Ames' favor, she had her hand on the door, but she was looking over and hadn't pulled on the door yet. So what that gets you is that Ms. Ames didn't mean to hit the officer with the door, not that she didn't hit the officer with the door, because the officer stepped in the way, I think, intentionally to try to stop her. Isn't that right? That's a possible interpretation. Well, I'm not trying to put words in your mouth, though. I'm trying to figure out what your view is considering the facts in the light most favorable to your client. What do you think the evidence shows, please? That her hand was on the door. Ms. Ames' hand? Ms. Ames' hand was on the door. She did not testify that she attempted to close it. But she didn't contradict Deputy Volpe's testimony that the deputy was struck by the door when she tried to close it. She did not contradict his testimony, but I don't believe the court has jurisdiction to decide that issue. Well, the question is whether or not there's a material issue of contested fact, and you don't have any fact that contradicts the deputy's testimony that she was hit repeatedly by the door. Just the sequence, as Ms. Ames describes it. Well, the sequence is not contradicting the fact. But let's assume that's correct. That possibly gets you the hair pull at that particular time. But there's no justification for that. Well, she doesn't dispute that she had at least one hand on the steering wheel, right? That's right. Okay. So the deputy says, I employed the hair pull technique as a distractive technique in order to get her to release her hand from the steering wheel. But that, okay, if you give the deputy that, that doesn't justify the hair pull on the ground because Ms. Ames is already on the ground. There's no need for that. Well, she's not complying with the deputy's order to give her both her hands behind her back so she can cuff her. But whether or not that force was reasonable is a jury question. Whether or not she had to pull her by the hair and smash her face into the ground three times or repeatedly is a jury question. Is that accurately applying the Graham factors? I mean, I think if we were dealing with a simple misdemeanor obstruction of a public servant arrest, maybe. But don't we have to look at the totality of the circumstances here and say that the rendering of Ms. Ames' obstruction, the resolution of that obstruction, was necessary in order to permit the aid crew to work on the son who was in a life-and-death situation, then we have to give more weight, do we not, to the level of force that the officer employed because it's a far more serious situation than simply making a misdemeanor resisting arrest. But I think in this context that weight should not be done at the trial court level or at this level. Well, this is a question of law, is it not, counsel? In other words, in a life-and-death situation, would we permit more force to be employed in order to clear the path for the aid crew to work on the patient? If the force was necessary. But that's a really ticklish question for us because we know under the law of qualified immunity the officer can be wrong. She just can't be unreasonable, right? Correct. And one of the factors that goes into that analysis is, as Judge Tomlin said, this is a life-or-death situation, and Ms. Ames was, I think, quite understandably frantic and not, according to the record I think read, even in the light construed most favorably to your client, she wasn't complying. She wasn't complying. And once everybody's out of the house, that's why I came back to where I started. Once everybody's out of the house, it seems extraordinary to me that there wasn't a realization that there's nothing preventing the EMTs from helping her son right there in the driveway. That's right. They let her get from the house all the way to the car without saying anything. It's not that. I mean, look at the picture. We're only talking a few feet from the house to the car. No, we're not because we're talking about the entrance to where the child was was all the way in the back of the house. They had to come all the way down the driveway, past the front of the house, across the house, and to the other driveway where the vehicle was. The crew was back at the aid car, right, because they had retreated to that location until the scene was rendered safe for them to perform their life-saving function. They had retreated back to the aid car, but the aid car hadn't moved. But it was out on the street, right? It was out on the street. So they were quite some distance. Well, I don't know what you mean by some distance. The aid car hadn't moved down the street where it was later. The aid car was still in front of the house. So what is it you think that when you said they let them come all the way around the house? You're losing me. Well, they're carrying this child or this person that's an adult. They're helping her get him out of the house, right? Right. Okay, so what is it you think that they should have done at that point, they meaning the police officer? To stop and say, hey, you know, we'll treat the child. We'll treat him. But they let her get the child into the car. After the child was in the car, she went back into the house to get something, and then she comes back out. Ms. Ames. Ms. Ames. Right. And no attempt to give aid to the person is given at all while she's in the house. They wait until she comes back out of the house, gets in the car, puts the key to start the car, and at that point she stops her. And Ms. Ames says, and Mr. Eby says, and his wife says, that there was no attempt to tell her that we'll treat the child here. But when they do say to her, look, you can't take him, she doesn't comply with that. I guess I'm having trouble because it seems to be that it's where your colleague started out as to say it's really an emergency situation case, not like an arrest case. And what is your response to that in terms of how the district court actually analyzed it? That's correct. I would consider this to be an emergency case. Okay. But I still say that when Ms. Ames was extracted from the vehicle, this court is assuming that the force, the laying on her, her telling the officer, I can't breathe, you're hurting me, I've had these injuries, and the officer continues to lay on her and continues to pull her up by the hair and hit her face into the ground. That could possibly be an attempt to disarm her or render her so that she can't resist, or it can be retaliation because she cursed at the officer or because she appeared angry or because she didn't let the officer into the house in the first place. But I read the record that she didn't have her cuffed yet when all that occurred. This all occurred when her arm, one of her arms, I think it was a right arm, was underneath her body. And the officer says, Give me your arm. And she's saying, I can't because you have your knee in my back. I mean, that's her testimony after, give me the arm because the knee's in my back. But that is, I'm not sure where the, even if we take exactly what she says is what happened, because we take it in light most favorable to her, and I'm looking at her testimony, how does that defeat qualified immunity? Because she's telling the officer that she can't give her arm. She's telling the officer that she's injuring her. And instead of the officer shifting to allow her arm to be removed, the officer is applying more force and grabbing her by the hair and smashing her face into the pavement or into the gravel. That's a jury, as to whether or not that was reasonable is a jury question. That issue should go to the jury. So this whole case telescopes down to that moment in effect? Well, I don't think you can just say that all of the force is collective. There was the force that was used in the vehicle. There was the force that was used to extract her from the vehicle. And then there was the force that was used after she told the officer that she had these medical problems. Well, let's just say, just for talking purposes, that in the vehicle and getting out of the vehicle was the only way that it's reasonable that that's the only way to get her out under the circumstances because she has her hand on the wheels and she's not getting out. Let's just say those were reasonable. If you were left with the force on the ground and the facts as we've taken them, then explain what your remaining claim would be. The remaining claim is the pulling of the hair while she's on the ground, using her body weight the way she was using it, in view of the fact that Ms. Ames was telling her that the reason that I can't give you my arm is because your body weight is on me, using the knee to knee her in the back after Ms. Ames has told her that I can't give you my arm and that you're hurting me, and then grabbing her by the hair and pushing her face into the ground. I don't think that has anything to do with attempting to save Colin's life or to render additional aid. I think that could be interpreted by a jury as punitive because, again, if you look at the entire sequence, the officer has got to be upset with Ames because Ames says, no, you can't come into my house. They can come, but you have to go. And then Ames also curses at her. The extra force at the end could have been used as punishment, and the court can't say as a matter of law that we know that was not done as punishment simply because the officer says, I did this. But the problem is that you're conceding that some force was appropriate here in order to remove her from the vehicle because at that point no aid could be rendered to her son until she was out of the way. So does this really come down to the force that was employed once she got on the ground was too excessive? Because we have case law that essentially says that we recognize that force is appropriate in order to effectuate some kinds of arrests. And the question is, should the officers be liable under 1983 because they used a little too much force? I mean, at what point do we draw the line? Any force that's used, that's gratuitous. Well, you say that's gratuitous. I mean, the problem is we've got Supreme Court cases that say not every push and shove that later appears to have been unreasonable or unnecessary in the peace of a judge's chambers is a violation of Section 1983. I agree with that, Your Honor, but this is not the same thing. After somebody tells youó Well, it's a shove, isn't it? No, it's not. Sure, it's shoving the face into the pavement. No, no. If the force used is gratuitous or if the force used is in retaliation and you can't determine as a matter of law as to whether it was, the case needs to go to the jury. Well, I guess it depends on the total amount of force that was used. I mean, in the grand scheme of life, based on the picture that was taken of her afterwards, there wasn't a great deal of force employed because she doesn't have a lot of injuries from it. I don't think the Fourth Amendment reasonable standard has anything to do with injury. Well, it has to if the law recognizes that there are some people that just are not going to go quietly and that we're going to have to take them the hard way. And that means that some level of force will necessarily have to be employed. So is it your position that if a jury could find that the force used was excessive, that there's a bright line there and that excessive force is something that has to go to the jury? If the issue is whether or not the type of force used was legally permissible, that can be resolved on qualified immunity. But if the issue is whether or not the force was gratuitous or the force was in some sort of way retaliatory because she refused to allow her in the house and because she cursed at her, that has to go to the jury. It looks like you're reframing the same question, so I just want to make sure I understand you. If the question is was the force reasonable, does it matter if subjectively the officer was ticked off by the circumstances? No, because the reasonableness analysis has to be looked at from the totality of the circumstances. From the totality of the circumstances. For an example, suppose— But then you changed the question on us a bit. You first said is it reasonable, but then you said, but if there's some inference that could be drawn that it was retaliatory force, then it has to go to the jury. But if you answered the first question that it was reasonable, you would never get to your second question, would you? No, I disagree because the reasonableness analysis has to look at the totality of the facts involved. For an example, an officer cannot just walk up to somebody and smack them in the head for no reason. No, because that would be unreasonable. Right, but it's not the amount of force used, or it's not whether or not an injury was— Right, I agree it's not the amount of injury, but it has to be reasonable force under the circumstances, right? Is it your position that any— Let's answer that question first. So do you agree that the primary analysis is, based on Supreme Court, is whether there's reasonable force that was used? No. My analysis is that whether or not the use of the force was reasonable. And I think that's different than talking about reasonable force. Whether the use of the force was reasonable. And if you're using force in a retaliatory— But you also have to use reasonable force. In other words, you can't use a shotgun when you could just hold somebody's arm, for example. Right, but the Fourth Amendment talks about whether or not the use of the force is reasonable. You have to look at the facts. And the reasonableness analysis has to take into consideration whether or not there's evidence that a jury could find that the force wasn't reasonable because it was used gratuitously or because it was used in retaliation for earlier conduct. And in this case, you can't say as a matter of law that the force that was used was reasonable because it was necessary to control Ms. Ames when a jury very well could consider that this force was used retaliatory, given the fact that she told them that she had this injury, that she could not give them her arm because it was tucked underneath her body, and that you were kneeing her in the back to force her down further onto the ground knowing that she couldn't extract her arm. A jury could very well find that that force was not reasonable because it was not done for police purposes but was done in retaliation. So I don't think you can separate the argument into little pieces. You have to look at the totality of the circumstances. One more, please. Counsel, is it your position that there was any force applied after she was subdued? After she was handcuffed? Not after she was handcuffed, but after she was immobilized on the ground, yes. All right. Thank you. Thank you. There are three record facts that I think really need to be clarified in the course of this argument. First off, Ms. Ames, in her recorded statement, did acknowledge that Officer Volpe told her, long before she got in the car the second time, that, quote, you need to let the EMT take him. She heard that. She chose not to act on it. She chose to ignore the officer's other warnings. Second, there is absolutely no record, even in Ms. Ames' own declaration, that the officer pulled her hair in the ground. That was repeated three times by counsel. If you look at ER 41 and ER 42, which is the declaration of Ms. Ames, no testimony whatsoever that Ms. Ames' hair was pulled on the ground. I thought that's how she was bashing her. No, it says that her head was slammed into the ground. Okay. It says nothing about pulled her hair and slammed her head into the ground, so there's not like that kind of movement. Could you respond to his fairly specific point that he was making toward the end, which is that very last moment where once she's out, she's on the ground. Ms. Ames says, the knee is in my back, so I couldn't move my arm, but continued hitting the head, leaving the hair out, but the head keeps having to get smashed into the ground. He says that at least raises a curious question as to whether that was reasonable force at that stage. I think there are two ways to look at that. First off, that's a prime example of what the case law means when an officer makes a factual error. There's no indication in the record that the officer knew that her hand was pinned due to the officer's action of having the knee on the back of Ms. Ames. That appears to be a simple factual error by the officer. Counsel suggests that we should infer from that that it was retaliatory, that all these bad things happened for a reason, but there's a difference. But his argument is that a reasonable juror could find that, counsel. I think for purposes of summary judgment, there's a difference between reading the facts in the light most favorable to Ms. Ames and speculating to the point of what's supported by the record. I think speculating that Deputy Volpe did this to retaliate, speculating that Deputy Volpe knew that the arm was trapped, none of that is present on the record. That's his argument. So what's your best response, that a reasonable juror could find that? The best response is a deputy who is factually mistaken in believing that the suspect will not give her her arm is entitled to use force to get that arm so that she can be handcuffed. The question is, why would it be unreasonable for a juror to decide otherwise? I think that it would be, based on the record that is before the court, it would be unreasonable for a jury to make that decision based on this record, and that's the record that Ames has to live with. There's nothing that remotely suggests a retaliatory motive. In fact, the district court dismissed Ms. Ames' First Amendment claims, which were based on this allegation of retaliation, finding that there was nothing in the record to support this retaliation theory. I think your time has expired. Thank you very much. Thank you both for your argument this morning. Thank you, and we'll take a look at that. The case of Ames v. King County is submitted.
judges: McKeown, Tallman, Christen